**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| EVAN GEFFNER and IVAN BABSIN on behalf of themselves, all others similarly situated, and the general public, <br><br> Plaintiffs, <br><br> v. <br><br> THE COCA-COLA COMPANY, <br><br> Defendant. | Case No.: 17-cv-7952 <br><br> <u>CLASS ACTION</u> <br><br> **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF NEW YORK'S UNFAIR AND DECEPTIVE BUSINESS PRACTICES LAW, FALSE ADVERTISING LAW, NEGLIGENT AND INTENTIONAL MISREPRESENTATION, RESTITUTION, AND BREACH OF EXPRESS & IMPLIED WARRANTIES** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs EVAN GEFFNER and IVAN BABSIN, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby bring this action against The Coca-Cola Company ("Coca-Cola"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief including the investigation of their counsel.

## INTRODUCTION

1.     Coca-Cola's ubiquitous beverage, Diet Coke, is sweetened with aspartame, a non-caloric sweetener, rather than sugar.  Because of the product's use of the term "diet," and its lack of calories, and the manner in which Coca-Cola markets Diet Coke, consumers reasonably believe that drinking Diet Coke will assist in weight loss or healthy weight management.

2.     Scientific evidence demonstrates this is wrong because nonnutritive sweeteners like aspartame interfere with the body's ability to properly metabolize calories, leading to weight gain and increased risk of metabolic disease, diabetes, and cardiovascular disease.

3.     Accordingly, Coca-Cola's marketing Diet Coke as "diet," and the manner in which Coca-Cola markets Diet Coke, is false, misleading, and unlawful.

4.     Plaintiffs bring this action on behalf of themselves, other Diet Coke consumers, and the general public, to enjoin Coca-Cola from continuing to misleadingly advertise Diet Coke, and to recover restitution and damages for the class.

## INTRADISTRICT ASSIGNMENT

5.     Pursuant to Local Civil Rule 50.1(d)(2)(b)(1), this action is properly assigned to the Manhattan Courthouse, because, as further set forth herein, a substantial part of the events or omissions giving rise to the claims occurred in New York County.

## THE PARTIES

6.     Plaintiff EVAN GEFFNER is a resident of Bergen County, New Jersey.

7.     Plaintiff IVAN BABSIN is a resident of Nassau County, New York.

8.     The Coca-Cola Company is a Delaware corporation with its principal place of business at One Coca-Cola Plaza, Atlanta, Georgia 30313.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, at least one member of the class of plaintiffs is a citizen of a State different from Coca-Cola.  In addition, more than two-thirds of the members of the class reside in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

10.     The Court has personal jurisdiction over Coca-Cola because Coca-Cola is authorized to transact business in New York by the Department of State.  Further, Coca-Cola advertised, marketed, distributed, offered for sale, and sold its product Diet Coke to consumers in New York and the United States, transacting business in New York County, in New York, and throughout the United States, including without limitation through extensive on-the-shelf presence in New York County, and online marketing intended to reach consumers in New York County.  Moreover, Coca-Cola has sufficient purposeful, systematic, and continuous minimum contacts with the various states of the United States, including New York, and has sufficiently availed itself of the markets of various states of the United States, including New York, to render the exercise of personal jurisdiction by this Court permissible.

11.     Venue is proper in this Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c), because a substantial portion of the acts forming the basis for the claims occurred in this district, and because Coca-Cola transacts substantial business generally in this district.


## FACTS

**A.      Diet Coke is Marketed to Assist in Weight Loss and Healthy Weight Management Due to Its Non-Caloric Artificial Sweetener, Aspartame**

12.     Coca-Cola uses the term "diet" in Diet Coke, on both its label and in advertising.

13.     Dictionary definitions of the term "diet" commonly refer to weight loss, or to other health benefits resulting from a special or limited selection of food or drink, including, for example, the following definitions:

a.    "eat sparingly, for health reasons or to lose weight."[1]

b.    "to limit the food that you take, esp. in order to lose weight."[2].

c.    "A special course of food to which a person restricts themselves, either to lose weight or for medical reasons."[3]

d.    "If you are on a diet, you eat special kinds of food or you eat less food than usual because you are trying to lose weight."[4]<u>Draft of First Amended Complaint in NY Diet Coke case.docx</u>

e.    "A regulated selection of foods, as for medical reasons or cosmetic weight loss."[5]

f.    "A regimen of eating and drinking sparingly so as to reduce one's weight."[6]

g.    "A particular selection of food, especially as designed or prescribed to improve a person's physical condition or to prevent or treat a disease."[7]

h.    "A limited amount of food that someone eats because they are trying to become thinner."[8]

14.    Coca-Cola uses the term "diet" to market Diet Coke because the product is sweetened with a non-caloric artificial sweetener, aspartame, rather than sugar.  Because a representation that a product is "diet" inherently and necessarily implies it will assist in weight loss, Coca-Cola's implicit promise is that, because Diet Coke does not contain sugar or

---

[1] https://www.vocabulary.com/dictionary/diet
[2] https://dictionary.cambridge.org/us/dictionary/english/diet
[3] https://en.oxforddictionaries.com/definition/diet
[4] https://www.collinsdictionary.com/dictionary/english/diet
[5] https://www.ahdictionary.com/word/search.html?q=diet
[6] https://www.merriamwebster.com/dictionary/diet?utm_campaign=sd&utm_medium=serp&utm_source=jsonld
[7] http://www.dictionary.com/browse/diet?s=t
[8] https://www.macmillandictionary.com/dictionary/american/diet_1

calories, it will assist in weight loss, or at least healthy weight management, *i.e.*, will not cause weight gain (in the same way that drinking water could not possibly result in weight gain), and that it is useful for those who must limit their sugar intake.

15.    Coca-Cola reinforces this message through the use of advertisements that emphasize the beneficial effects of Diet Coke on body weight and composition.

16.    For example, Coca-Cola early marketing of Diet Coke is demonstrative of how Coca-Cola has historically positioned this product as one that will assist in weight loss, healthy weight management and not cause weight gain.

17.    Coca-Cola's marketing of Diet Coke in the 1980s began with a longstanding ad campaign that Diet Coke "will not go to your waist," and included a blurb that would flash on the screen stating that Diet Coke is, "suitable for carbohydrate and calorie-reduced diets."

18.    A 1984 Diet Coke television advertisement depicts a group of skinny males and females engaged in a series of athletic activities, with the lyrics "when feeling good is on your mind" playing in the background.   https://www.youtube.com/watch?v=WIWvqk-TkY4.   This advertisement clearly reinforces the notion that drinking Diet Coke will keep consumers feeling good, as they will not gain weight and will not develop health issues as a result of consuming Diet Coke.

19.    In the below 1984 Diet Coke television advertisement, at approximately 15 seconds in, it depicts a man in a pair of gigantic pants demonstrating all the weight that he lost from drinking Diet Coke, clearly implying that drinking Diet Coke will lead to weight loss. https://www.youtube.com/watch?v=BHL22ZGGTZM.

20.    A 1985 Diet Coke television commercial with the lyrics "just for the shape of it" at 0:20 second in, depicts two skinny women in bathing suits drinking diet coke, implying that

drinking diet coke will keep consumers in shape.  This states affirmatively that Diet Coke has the women's' bodies' bests interests at heart and will not cause negative health effects such as weight gain.  https://www.youtube.com/watch?v=tEYnSTL08sg&feature=youtu.be.

21.    This 1993 Diet Coke television advertisement depicts a group of women running to a window in an office building to watch the "Diet Coke break" in which a male construction worker below the office takes his shirt off to reveal chiseled abs, and drinks a diet coke.  This ad clearly implies that drinking Diet Coke will lead to the body of the construction worker and will even attract women.  This again affirmatively implies that drinking Diet Coke will keep a consumer in shape and certainly will not lead to weight gain. https://www.youtube.com/watch?v=0G3ao6uZeYk&feature=youtu.be.

22.    This 1997 television commercial depicts a group of women in an office waiting for the hour of 11:30 a.m. to arrive so that they can watch a very fit male deliver Diet Coke to the office and drink a Diet Coke, implying drinking Diet Coke will lead to a great physique and will attract women.  This again affirmatively implies that drinking Diet Coke will keep a consumer in shape and certainly will not lead to weight gain. https://www.youtube.com/watch?v=99ZZBCfHaJs.

23.    This 2007 Diet Coke television commercial continues the trend of "Diet Coke Breaks" and depicts a group of beautiful women who enter an elevator, press the panic button, and watch as an extremely fit male rappels down into the elevator to save them.  The ad then ends with "create your own Diet Coke break."  This ad again affirmatively implies that drinking Diet Coke will keep a consumer in shape and certainly will not lead to weight gain. https://www.youtube.com/watch?v=l0O8t4zXQy8.

24.    This theme is also conveyed through print advertisements, such as these recent

"all curves. No calories" Diet Coke advertisements, which appear to depict a skinny, bare buttocks, indicating that drinking Diet Coke will lead to all curves because of the lack of calories.





25.     Similarly, the below Diet Coke print advertisement depicts a bottle that is skinny enough for the label to hang off the sides of the bottle in much the manner clothing might hang off the body of a person who lost weight, indicating that drinking Diet Coke will assist with weight loss.



26.    This "regret nothing" Diet Coke advertisement depicts two skinny women at the beach drinking diet coke, implying drinking Diet Coke will lead to a beach body with no regrets.



27.    In this picture of a group of skinny women, which says "good taste is about making a statement," it is clear that the statement is that a person who drinks Diet Coke will be

as skinny as the women depicted in the ad.



28.     These ads of skinny, well-toned male models, pouring and drinking Diet Coke, imply that drinking Diet Coke will lead to such a physique, and certainly will not lead to weight gain.









29.    In 2013 Coca-Cola decided to revive an age old advertising campaign depicting men who are in great shape drinking Diet Coke.  For example, in the below television advertisement, a group of thin females drinking Diet Coke roll a can of Diet Coke down a hill to a very fit male gardener mowing a lawn.  When the male gardener opens the can, it splashed all over him, forcing him to take off his shirt revealing chiseled abs, causing the group of women's' jaws to drop.  This implies that drinking diet coke will lead to the physique of the male gardener mowing the lawn, and most certainly will not lead to weight gain. https://www.youtube.com/watch?v=PwYCvTpYMCA.  This campaign of reintroducing Diet Coke's "most famous ambassador, the Diet Coke hunk" is best explained in this behind the scenes   video   of   the   making   of   the   above   television   advertisement. https://www.youtube.com/watch?v=WPgxNmSPXME.  This theme was also conveyed through print advertisements, such as the one below.



30.     The below Diet Coke can, which is depicted as being thin enough to fit within a classic Coke can, implies that drinking Diet Coke will lead to weight loss.



31.     This Diet Coke print advertisement at a gym, featured in between two skinny

women running on treadmills, implies that drinking Diet Coke will assist in weight loss in the same way that running on the treadmill might.



32.     Coca-Cola also reinforces its messaging that Diet Coke assists in weight loss, healthy weight management, and does not cause weight gain, in other, less direct ways.

33.     For example, Coca-Cola is a member of the American Beverage Association, a trade association that represents America's non-alcoholic beverage industry.  In fact, a search of "Coke" in the member directory of the American Beverage Association yielded 560 results.

34.     The American Beverage Association, on behalf of its members, including Coca-Cola, funded a study of the effects of diet soft drinks.  According to the American Beverage Association, which published an article about the study in its "Research & Education" section of its website, this industry funded study purports to show that "diet beverages can help with

weight loss.  The article claims those in the study who drank diet beverages over the course of 12 weeks lost an average of 4 pounds more than those who didn't drink diet beverages."[9]

35.     An article published 3 days later, on May 30, 2014, also in the "Research & Education" section of the American Beverage Association website, asks its readers if they are "[l]ooking for ways to shed a few pounds before swimsuit season kicks into high gear? Did you know that soft drinks can be an effective tool for weight loss? It's true . . . low-calorie sweeteners can help reduce calories and sugar intake and aid in maintaining a healthy weight – or even dropping some weight. . . . Many people trying to lose weight often choose diet beverages that contain low-calorie sweeteners as a way to reduce their caloric intake.  So, if it fits your lifestyle – try one of the many low- and no-calorie beverages that our member companies produce!"[10]

36.     The "many low- and no-calorie beverages" portion of the article is hyperlinked to a webpage stating "America's beverage companies—Coca-Cola, Dr Pepper, and Pepsi— have come together to support your family's efforts to balance what you eat, drink, and do. We know that an important part of finding that balance is reducing the sugar from beverages in your family's diet."[11]  This page includes a link titled "Beverage Choices."  Clicking on "Beverage Choices" brings you to a page that allows you to "[e]xplore beverages choices from Coke," including Diet Coke.

37.     Coca-Cola is thus funding, through the American Beverage Association, marketing of diet soft drinks as not only assisting in healthy weight management, but in affirmatively aiding in weight loss.  This is a message that has been consistently conveyed since Coca-Cola began marketing Diet Coke.

---

[9] https://www.ameribev.org/education-resources/blog/post/good-news-about-diet-beverages/ (dated May 27, 2014)
[10] https://www.ameribev.org/education-resources/blog/post/how-about-a-diet-soda/ (dated May 30, 2014)
[11] http://www.balanceus.org/en/

38.      Surprisingly, Coca-Cola, through the American Beverage Association, maintains this position despite the fact that in 1983, under its predecessor name, the National Soft Drink Association, sponsored an objection to the use of aspartame in soft drinks, although it ultimately did not formally lodge the objection with the Food and Drug Administration.  Among the Association's objections to aspartame was this:  "Aspartame has been demonstrated to inhibit the carbohydrate-induced-synthesis of the neurotransmitter serotonin (Wurtman affidavit). Serotonin blunts the sensation of craving carbohydrates and thus is part of the body's feedback system that helps limit consumption of carbohydrate to appropriate levels. ***Its inhibition by aspartame could lead to the anomalous result of a diet product causing increased consumption of carbohydrates***" (emphasis added). [12] Thus, the objection was based, in part, on the notion that because aspartame caused the increased consumption of carbohydrates, it would not be appropriate for use in diet soft drinks.

39.      Physicians and other researchers agree that consumers purchase "diet" soft drinks to assist in healthy management and to aid in their efforts to lose weight. *See*, *e.g.*, Madjd, et al., "Effects On Weight Loss In Adults Of Replacing Diet Beverages With Water During A Hypoenergetic Diet: A Randomized, 24-Wk Clinical Trial," Am J Clin Nutr. 2015;102(6):1305-1312 (Nov. 2015) ("The general population believes that diet beverages (DBs) can help them to lose weight, and many obese people drink DBs, believing that this simple strategy would be helpful in reducing weight"); Pearlman, et al, "The Association Between Artificial Sweeteners and Obesity," Curr Gastroenterol Rep (2017) 19: 64 (Nov, 2017) ("Artificial sweeteners are marketed as a healthy alternative to sugar and as a tool for

---

[12] "Objections Of The National Soft Drink Association To A Final Rule Permitting The Use Of Aspartame In Carbonated Beverages And Carbonated Beverage Syrup Bases And A Request For A Hearing On The Objections," July 28, 1983.  Emphasis added.  The 1983 NSDA draft appears at Congressional Record – Senate – May 7, 1985, beginning at 10818.  The critical language quoted above is at page 10822.

weight loss"); Yang, Q., "Gain Weight by 'Going Diet?' Artificial Sweeteners and the Neurobiology of Sugar Cravings." Yale J. of Bio. & Med., Vol. 83, No. 2, pp. 101-108 (June 2010) ("Intuitively, people choose non-caloric artificial sweeteners over sugar to lose or maintain weight").

40.     The term "diet" also signifies something other than just that the product contains no sugar.  American soft drink manufacturers have, at one time or another, marketed a "No Sugar" drink.  For example, Coca-Cola simultaneously sells "Diet Coke" alongside the "Coca-Cola Zero Sugar" product, and consumers consequently are put on notice that there is a distinction between "diet" and "no sugar."

41.     An April 2018 survey of 400 California diet soft drink consumers, and 400 nationwide soft drink consumers confirms that the vast majority of consumers expect a diet soft drink to either help the consumer lose weight, or help maintain/not affect their weight (75.8% of California diet soft drink consumers and 77.0% of Nationwide diet soft drink consumers).  Similarly, 75.7% of the 330 California consumers that had purchased Diet Coke, and 77.7% of 336 nationwide consumers that had purchased Diet Coke, expected it to help them lose weight, or help them maintain/not affect their weight.  The survey results are shown in the table below.

| | California Consumers (400 Respondents) | Nationwide Consumers (400 Respondents) | California Diet Coke Consumers (330 Respondents) | Nationwide Diet Coke Consumers (336 Respondents) |
|---|---|---|---|---|
| Expect drinks labeled "diet to help you lose weight | **12.5%** | **15.0%** | **11.8%** | **15.2%** |

| | | | | |
|---|---|---|---|---|
| Expect soft drinks labeled "diet" to help you maintain/not affect your weight | **63.3%** | **62.0%** | **63.9%** | **62.5%** |
| Expect soft drinks labeled "diet" to make you gain weight | 3.3% | 2.0% | 3.0% | 2.4% |
| Don't have any expectations | 21.0% | 21.0% | 21.2% | 19.9% |

42.     Due to the prominent use of the term "diet" in the product's name, Diet Coke, and the way in which Coca-Cola markets Diet Coke, consumers reasonably believe that the product will assist in weight loss, or at least healthy weight management, for example, by not causing weight gain, and that Diet Coke will not increase their vulnerability to metabolic disease such as diabetes.

**B.    Aspartame – The Undisclosed Dangers**

43.     Artificial, nonnutritive sweeteners were first introduced in the early 20th century, and thus humans have been consuming them for only about a century. They are typically 300 - 13,000 times sweeter than sugar.

44.     Although aspartame does not contain calories, a recent and growing body of scientific research demonstrates that it, like other nonnutritive sweeteners, causes weight gain, is more harmful to a diet than consumption of water, and contributes to the development of metabolic disease such as diabetes.

45.     Studies of animals have already established that aspartame causes "marked glucose intolerance," by changing intestinal microbiota.  Suez J, et al., "Artificial Sweeteners

17

Induce Glucose Intolerance by Altering the Gut Microbiota." Nature, pp.181-86 (Oct. 2014). This was true of aspartame, saccharin and sucralose, the three artificial sweeteners tested in that study.   Another animal study confirmed that aspartame consumption "resulted in hyperglycemia and an impaired ability to respond to insulin."   Palmnas, et al., "Low-Dose Aspartame Consumption Differentially Affects Gut Microbiota-Host Metabolic Interactions in the Diet- Induced Obese Rat," PLOS ONE, Oct. 2014 Vol. 9 Issue 10.   Hyperglycemia is a hallmark sign of both Type 1 and Type 2 diabetes.

46.     These effects are long-term, transferrable from mother to child.   "[A]nimals whose mothers consumed aspartame during pregnancy consumed more energy than those born to mothers fed a standard diet, both during short-term and in a long-term exposure to palatable food."   Those offspring consumed more sweet foods during their own adulthoods, and showed "a greater susceptibility to alterations in metabolic parameters, such as increased glucose, LDL and triglycerides."   von Poser Toigo, "Metabolic And Feeding Behavior Alterations Provoked By Prenatal Exposure To Aspartame," Appetite 87 (2015).   See also Azad, et al, "Association Between Artificially Sweetened Beverage Consumption During Pregnancy and Infant Body Mass   Index,"   JAMA   Pediatr.   doi:10.1001/jamapediatrics.2016.0301   (May   2016) ("Interestingly, rodent studies have shown that maternal NNS [Non-nutritive sweeteners, such as aspartame] consumption in pregnancy also predisposes offspring to obesity, with NNS exposed offspring exhibiting stronger preferences for sweet foods, increased postnatal weight gain, altered lipid profiles, and increased insulin resistance in adulthood.

47.     The study by Azad, et al., referred to in the preceding paragraph, established that the same holds true for humans.   The researchers stated, "[t]o our knowledge, our results

18

provide the first human evidence to support these findings, suggesting that prenatal NNS exposure may contribute to infant weight gain and early childhood obesity."

48.     In addition to its contribution to the development of diabetes, aspartame does not assist with weight loss, or even with weight maintenance.  Indeed, as the National Soft Drink Association put it in 1983, consumption of aspartame leads to "the anomalous result" of a diet product increasing its consumer's weight.

49.     In this respect, once again, animals have led the way.[13]  It is clear that "[t]here now exists a body of evidence, from a number of investigators, that animals chronically exposed to any of a range of LCSs [low-calorie sweeteners] – including saccharin, sucralose, acesulfame potassium, aspartame, or the combination of erythritol + aspartame – have exhibited one or more of the following conditions: increased food consumption, lower post-prandial thermogenesis, increased weight gain, greater percent body fat, decreased GLP-1 release during glucose tolerance testing, and significantly greater fasting glucose, glucose area under the curve during glucose tolerance testing, and hyperinsulinemia, compared with animals exposed to plain water or – in many cases – even to calorically-sweetened foods or liquids." Fowler, "Low-Calorie Sweetener Use And Energy Balance: Results From Experimental Studies In Animals, And Large-Scale Prospective Studies In Humans," Physiol Behav. 2016 Oct 1;164(Pt B):517-523. doi: 10.1016/j.physbeh.2016.04.047 (April 2016).

50.     Aspartame produces the same conditions in humans:  "These studies have offered both support for, and biologically plausible mechanisms to explain, the results from a series of large-scale, long-term prospective observational studies conducted in humans, in which longitudinal increases in weight, abdominal adiposity, and incidence of overweight and

---

[13] "Human research must rely on subjective ratings and voluntary diet control.  Rodent models helped elucidate how artificial sweeteners contribute to energy balance."  Yang, "Gain Weight by 'Going Diet?'  Artificial Sweeteners and the Neurobiology of Sugar Cravings," Yale Journal of Biology and Medicine 83 (2010).

obesity have been observed among study participants who reported using diet sodas and other LCS-sweetened beverages daily or more often at baseline." Fowler, *supra*.  Furthermore, "frequent use of diet beverages has been associated prospectively with increased long term risk and/or hazard of a number of cardiometabolic conditions usually considered to be among the sequelae of obesity: hypertension, metabolic syndrome, diabetes, depression, kidney dysfunction, heart attack, stroke, and even cardiovascular and total mortality."  Fowler, *supra*. Moreover, "[r]everse causality does not appear to explain fully the increased risk observed across all of these studies, the majority of which have included key potential confounders as covariates." Fowler, *supra*.

51.     Another study found that, "[u]sing different models and approaches to account for initial "indication" and changing usage patterns, we consistently found low-calorie sweetener use associated with weight gain and expanding waistline."  Chia, et al., "Chronic Low-Calorie Sweetener Use and Risk of Abdominal Obesity among Older Adults:  A Cohort Study," PLoS ONE 11(11): e0167241. doi:10.1371/journal.pone.0167241 (November 2016). The study was long-term and adjusted for virtually all contrary factors.  As the researchers stated, "[t]he strengths of our study include the follow-up period of up to 28 years and the use of 7-day food diaries at multiple follow-up visits.  The food diary provides details of low-calorie sweetener use in all food products including coffee, tea, and dessert, which allow for a more comprehensive assessment of low-calorie sweetener consumption beyond diet soda. Previous studies assessed diet soda consumption using food frequency questionnaires with participant assessment done at study centers [19±24] or using mailed questionnaires.  In addition, we took into consideration diet quality using the DASH score.  Lastly, since we accounted for body composition at the time of assessment of low-calorie sweetener use, the

possibility that risk of weight gain largely explains the observed associations between low-calorie sweetener use and forms of obesity is minimized."

52.     Viewed differently, studies have not shown that consumption of aspartame offers any of the benefits, which would be expected from a "diet" drink.  For example, one study found that "[t]he addition of NNS [non-nutritive sweeteners] to diets poses no benefit for weight loss or reduced weight gain without energy restriction.  There are long-standing and recent concerns that inclusion of NNS in the diet promotes energy intake and contributes to obesity."  Mattes and Popkin, "Nonnutritive Sweetener Consumption In Humans: Effects On Appetite And Food Intake And Their Putative Mechanisms," Am J Clin Nutr 2009;89:1–14 ( 2009).   Similarly, "[t]he absence of evidence to support the role of ASBs [artificially sweetened beverages] in preventing weight gain and the lack of studies on other long-term effects on health strengthen the position that ASBs should not be promoted as part of a healthy diet."  Borges, et al., "Artificially Sweetened Beverages and the Response to the Global Obesity Crisis," PLoS Med 14(1):e1002195. doi:10.1371/journal.pmed.1002195 (Jan. 2017).

53.     Multiple studies have consistently supported these conclusions.  For example,

    a.     A 2009 review article found that the "addition of [nonnutritive sweeteners] to diet poses no benefit for weight loss or reduced weight gain without energy restriction," and noted "long-standing and recent concerns that inclusion of [nonnutritive sweeteners] in the diet promotes energy intake and contributes to obesity."[14]

    b.     Another review article, in 2010, found that "[d]ata from large, epidemiologic studies support the existence of an association between

---

[14] Mattes RD, et al., "Nonnutritive Sweetener Consumption in Humans: Effects on Appetite and Food Intake and Their Putative Mechanisms." *Am. J. Clin. Nutr.*, Vol. 89, No. 1, pp. 1-14 (Jan. 2009).

artificially-sweetened beverage consumption and weight gain in children."[15]

c.      Another review article from 2010 said "research studies suggest that artificial sweeteners may contribute to weight gain."[16]

d.      A 2013 review article by a federally-funded Purdue University researcher, Susan E. Swithers, assessed differences between diet soda consumers and non-consumers among over 450,000 participants across 14 independent prospective cohort studies, with an average 16-year follow-up. Swithers found that "accumulating evidence suggests that frequent consumers of these sugar substitutes may also be at increased risk of excessive weight gain, metabolic syndrome, type 2 diabetes, and cardiovascular disease," and that "frequent consumption of high-intensity sweeteners may have the counterintuitive effect of inducing metabolic derangements." She further stated that "[r]ecent data from humans and rodent models have provided little support for [artificially sweetened beverages] in promoting weight loss or preventing negative health outcomes such as [type 2 diabetes], metabolic syndrome, and cardiovascular events. Instead, a number of studies suggest people who regularly consume [artificially sweetened beverages] are at increased risk comparted to those that do not consume [artificially sweetened

---

[15] Brown RJ, et al., "Artificial Sweeteners: a Systematic Review of Metabolic Effects in Youth." *Int'l J. of Ped. Obesity*, Vol. 5, No. 4, pp. 305-12 (Aug. 2010).
[16] Yang, Q., "Gain Weight by 'Going Diet?' Artificial Sweeteners and the Neurobiology of Sugar Cravings." *Yale J. of Bio. & Med.*, Vol. 83, No. 2, pp. 101-108 (June 2010) [hereinafter "Yang"].

beverages]," and "with the magnitude of the increased risks similar to those associated with [sugar-sweetened beverages]."[17]

e.      A 2014 study found that "consumption of commonly used [non-caloric artificial sweetener] formulations drives the development of glucose intolerance through induction of compositional and functional alterations to the intestinal microbiota," and because of this "link [between] [non-caloric artificial sweetener] consumption, symbiosis and metabolic abnormalities," found that artificial sweeteners "may have directly contributed to enhancing the exact epidemic that they themselves were intended to fight."[18]

f.      In 2015, researchers reported "a striking dose-response relationship," wherein "increasing [diet soda intake] was associated with escalating abdominal obesity, a pathway for cardiometabolic risk," and noted that "[h]igh incidences of overweight and obesity, hypertension, metabolic syndrome, diabetes mellitus, kidney dysfunction, heart attack, and hemorrhagic stroke have all recently been associated with frequent [nonnutritive sweetener intake] and [diet soda intake]."[19]

g.      Epidemiological studies also implicate artificial sweeteners in causing weight gain. For example, the San Antonio Heart Study "observed a classic, positive dose-response relationship between

_____

[17] Swithers, SE, "Artificial Sweeteners Produce the Counterintuitive Effect of Inducing Metabolic Derangements." *Trends in Endocrinology & Metab.*, Vol. 24, No. 9, pp. 431-41 (Sept. 2013).
[18] Suez J, et al., "Artificial Sweeteners Induce Glucose Intolerance by Altering the Gut Microbiota." *Nature*, pp.181-86 (Oct. 2014).
[19] Fowler, S, et al., "Diet Soda Intake is Associated with Long-Term Increases in Waist Circumference in a Biethnic Cohort of Older Adults: The San Antonio Longitudinal Study of Aging." *J. of the Am. Geriatrics Society* (March 17, 2015).

[artificially sweetened] beverage consumption and long-term weight gain," and found that consuming more than 21 artificially sweetened beverages per week, compared to those who consumed none, "was associated with almost-doubled risk" of overweight or obesity.[20]

h.    A study of beverage consumption among children and adolescents aged 6-19 found that "BMI is positively associated with consumption of diet carbonated beverages."[21]

i.    A two-year study of 164 children found that "[i]ncreases in diet soda consumption were significantly greater for overweight and subjects who gained weight as compared to normal weight subjects."[22]

j.    A July 2017 study found that artificial sweeteners did not lead to any significant weight loss in more than 1,000 participants in seven clinical trials. At the same time, combined data from 30 observational studies involving more than 400,000 participants showed that artificial sweeteners are associated with obesity, high blood pressure, type 2 diabetes and heart health problems.[23]

k.    A study published in August 2017 suggested artificial sweetener use increases the risk of type 2 diabetes by 21%, which is about half the

[20] Fowler, S, et al., "Fueling the Obesity Epidemic? Artificially Sweetened Beverage Use and Long-Term Weight Gain." *Obesity*, Vol. 16, No. 8, pp. 1894-900 (Aug. 2008).

[21] Forshee RA, et al., "Total Beverage Consumption and Beverage Choices Among Children and Adolescents." *Int'l J. of Food Sci. & Nutr.*, Vol. 54, No. 4, pp. 297-307 (July 2003); *see also* Berkey CS, et al., "Sugar-Added Beverage sand Adolescent Weight Change." *Obesity Research*, Vol. 12, No. 5, pp. 778-88 (May 2004) (in study of more than 10,000 U.S. children aged 9-14, finding, for boys, intakes of diet soda "were significantly associated with weight gains").

[22] Blum, JW, et al., "Beverage Consumption Patterns in Elementary School Aged Children Across a Two-Year Period." *J. of Am. Coll. of Nutr.*, Vol. 24, No. 2, pp. 93-98 (Apr. 2005).

[23] Azad, MB, et al., "Nonnutrive sweeteners and cardiometabolic health: a systematic review and meta-analysis of randomized controlled trials and prospective cohort studies." *Canadian Medical Association Journal*, Vol. 189, No. 28, pp. E929-E939 (July 17, 2017).

increased risk seen with sugar-sweetened beverage use, at 43%.[24]
Another study indicates daily diet soda consumption is associated with a
36% increase in risk of metabolic syndrome, and a 67% increase in risk
of type 2 diabetes compared with non-drinkers.[25]

l.      As recently as April 23, 2018 – a week before filing this
amended complaint – a new study confirmed that aspartame disrupts the
biochemical pathways related to fat and energy metabolism.  Hoffman,
B. et al., "The Influence of Sugar and Artificial Sweeteners on Vascular
Health during the Onset and Progression of Diabetes," presented at the
annual Experimental Biology meeting in San Diego.

## COCA-COLA'S UNLAWFUL ACTS

**A.**   **Coca-Cola Misleadingly Marketed Diet Coke as Promoting Weight Loss or Healthy Weight Management**

54.     Because the aspartame in Diet Coke is likely to cause weight gain and does not help with weight loss or healthy weight management, and the aspartame increases the risk of metabolic disease such as diabetes, Coca-Cola's marketing the product as "diet," and the manner in which Coca-Cola markets Diet Coke, is false and misleading.

55.     Coca-Cola is, or reasonably should be aware, of the scientific evidence that consuming aspartame can cause weight gain, does not contribute to weight loss or healthy weight management, and increases the risk of metabolic disease such as diabetes. That evidence has been in the published and public domain, and recounted in major news outlets.

---

[24] Huang, M, et al., "Artificially sweetened beverages, sugar-sweetened beverages, plain water, and incident diabetes mellitus in postmenopausal women: the prospective Women's Health Initiative observational study." *Am. J. Clin. Nutr.*, Vol. 106, No. 2, pp. 614-22 (Aug. 2017).

[25] Nettleton, JA, et al., "Diet soda intake and risk of incident metabolic syndrome and type 2 diabetes in Multi-Ethnic Study of Artherosclerosis (MESA)." *Diabetes Care*, Vol. 32, No. 4, pp. 688-94 (Apr. 2009).

56.     Despite the fact that Coca-Cola is, or reasonably should have been aware that promoting Diet Coke as "diet," and the manner in which Coca-Cole markets Diet Coke, was false and misleading, Coca-Cola continued to do so anyway, because this representation is the major driver of Diet Coke sales.

57.     Moreover, while touting Diet Coke as "diet," and containing zero calories, Coca-Cola deceptively omitted material information, namely that despite its lack of calories, the consumption of Diet Coke can lead to weight gain, does not assist in weight loss or healthy weight management, and contributes to metabolic disease, diabetes, and cardiovascular disease.

**B.     Coca-Cola Violated FDA and New York Food Labeling Regulations**

58.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ("FDCA"), governs the labeling of foods and beverages. Pursuant to the New York State Agriculture and Markets Law § 201, §71.05, New York has adopted the FDCA and its implementing regulations as its own law.

59.     The FDCA prohibits the labeling of food that is "false or misleading in any particular," 21 U.S.C. § 343(a).

60.     New York EDN. Law § 6815 similarly provides that "[a] drug or device shall be deemed to be misbranded: a. If its labeling is false or misleading in any particular."

61.     FDA regulations provide that companies may use the term "diet" in the brand name or label of a soft drink described in section 343(r)(2)(D) *only* when it is not false or misleading. *See* 21 U.S.C. § 343(r)(2)(D); 21 C.F.R. § 101.13(q)(2).

62.     Coca-Cola's labeling Diet Coke as "diet," and the manner in which Coca-Cola markets Diet Coke, is false and misleading for the reasons described herein.  Accordingly,

Coca-Cola has violated 21 U.S.C. §§ 343(a) and 343(r)(2)(D), 21 C.F.R. § 101.13(q)(2), and the corresponding sections of New York State Agriculture and Markets Law § 201, §71.05.

63.     In labeling Diet Coke, Coca-Cola also "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include that consuming the aspartame in Diet Coke can lead to weight gain or make it difficult to maintain a healthy weight.

64.     In labeling Diet Coke, Coca-Cola similarly failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, Coca-Cola failed to disclose the increased risk of weight gain, and of serious chronic disease, likely to result from the usual consumption of Diet Coke in the customary manner.

## PLAINTIFFS' PURCHASE, RELIANCE & INJURY

65.     Plaintiff EVAN GEFFNER has been a frequent purchaser of Diet Coke for many years. For over 20 years, Plaintiff has purchased at least one can of Diet Coke every week, usually from convenience stores in New York, New York.

66.     Plaintiff EVAN GEFFNER has struggled with obesity for many years. He purchased and consumed Diet Coke in large part because he believed, based on Coca-Cola's advertising the product as "Diet," and the manner in which Coca-Cola markets Diet Coke, that it would contribute to healthy weight management, and, due to its lack of calories, would not cause him to gain weight.

67.     Plaintiff IVAN BABSIN has been a frequent purchaser of Diet Coke for many years. For over 20 years, Plaintiff has purchased at least dozens of cans of Diet Coke each month, usually from convenience stores in New York, New York.

68.     Plaintiff IVAN BABSIN has struggled with obesity for many years. He purchased and consumed Diet Coke in large part because he believed, based on Coca-Cola's advertising the product as "Diet," and the manner in which Coca-Cola markets Diet Coke, that it would contribute to healthy weight management, and, due to its lack of calories, would not cause him to gain weight.

69.     Plaintiffs would not have purchased Diet Coke at the price they paid, and may not have purchased it at all, absent Coca-Cola's false, misleading, and unlawful labeling and marketing.

70.     The Diet Coke cost more than a product, represented to be a diet product, would cost if the truth were revealed that the product was not a diet product at all.

71.     If Coca-Cola were enjoined from making the misleading claims, the market demand and price for Diet Coke would drop, as it has been artificially and fraudulently inflated due to Coca-Cola's use of false, misleading, and unlawful labeling and marketing.

72.     For these reasons, the Diet Coke was worth less than what Plaintiffs paid for it.

73.     Instead of receiving a beverage that would help assist Plaintiffs in achieving and maintaining a healthy weight, Plaintiffs received a beverage whose consumption is likely to lead to weight gain.

74.     Plaintiffs lost money as a result of Coca-Cola's deceptive claims and unfair practices in that they did not receive what they paid for when purchasing the Diet Coke.

75.     Plaintiffs detrimentally altered their position and suffered damages in an amount equal to what they paid for the product.

76.     Plaintiffs would consider purchasing Diet Coke in the future if the product were properly labeled.

## CLASS ACTION ALLEGATIONS

77.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs seek to represent a class comprised of all persons in New York who, on or after October 16, 2011, purchased, for personal or household use, and not for resale, Diet Coke in cans or bottles.

78.     Plaintiffs nevertheless reserve the right to divide into subclasses, expand, narrow, or otherwise modify the class definition prior to (or as part of) filing a motion for class certification.

79.     The members in the proposed class and subclass are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

80.     There are questions of law and fact common to the class, Fed. R. Civ. P. 23(a)(2), which Plaintiffs may seek to litigate on an individual basis pursuant to Fed. R. Civ. P. 23(c)(4), including without limitation:

81.     Whether Diet Coke sold during the class period was likely to no assist in weight loss or healthy weight management or result in weight gain or increased risk of metabolic disease, diabetes, and cardiovascular disease;

82.     Whether advertising Diet Coke as "diet," and the manner in which Coca-Cola marketed Diet Coke would be likely to deceive a reasonable consumer;

83.     Whether Diet Coke sold during the class period was misbranded because it was in violation of any FDA or New York state food labeling statute or regulation;

84.     Whether Coca-Cola expressly or impliedly warranted that Diet Coke was "diet";

85.     Whether Coca-Cola impliedly warranted that Diet Coke would assist in weight loss or healthy weight management;

86.     Whether Coca-Cola breached any express or implied warranties;

87.     The proper injunctive or prospective relief; and

88.     The proper amount of reasonable litigation expenses and attorneys' fees.

89.     Plaintiffs' claims are typical of class members' claims in that they are based on the same underlying facts, events, and circumstances relating to Coca-Cola's conduct.

90.     Plaintiffs will fairly and adequately represent and protect the interests of the class, have no interests incompatible with the interests of the class, and have retained counsel competent and experienced in class action litigation, including within the food and beverage industry.

91.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each class member is small such that, absent representative litigation, it would be infeasible for class members to redress the wrongs done to them.

92.     Questions of law and fact common to the class predominate over any questions affecting only individual class members.

93.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(c)(4).

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**UNFAIR AND DECEPTIVE BUSINESS PRACTICES, N.Y. GEN. BUS. L. § 349**

94.    Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

95.    Coca-Cola's conduct constitutes deceptive acts or practices or false advertising in the conduct of business, trade or commerce or on the furnishing of services in New York which affects the public interest under N.Y. Gen. Bus. L. § 349.

96.    As alleged herein, by advertising, marketing, distributing, and selling the Product Diet Coke to Plaintiffs and other class members with false or misleading claims and representations, Coca-Cola engaged in, and continues to engage in, deceptive acts and practices.

97.    As alleged herein, by misbranding the product Diet Coke, Coca-Cola engaged in, and continues to engage in, deceptive acts and practices.

98.    Coca-Cola's conduct was materially misleading to Plaintiffs and the class.

99.    During the class period, Coca-Cola carried out a plan, scheme and course of conduct which was consumer oriented.

100.   As a direct and proximate result of Coca-Cola's violation of N.Y. Gen. Bus. L. § 349, Plaintiffs and the class were injured and suffered damages.

101.   The injuries to Plaintiffs and the class were foreseeable to Coca-Cola and thus, Coca-Cola's actions were unconscionable and unreasonable.

102.   Coca-Cola is liable for damages sustained by Plaintiffs and the class to the maximum extent allowable under N.Y. Gen. Bus. L. § 349.

103.    Furthermore, pursuant to N.Y. Gen. Bus. L. § 349 (h), "In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing Plaintiff.

104.    Plaintiffs further make a claim for all of the above damages pursuant to N.Y. Gen. Bus. L. § 349 (h).

105.    Pursuant to N.Y. Gen. Bus. L. § 349(h), Plaintiffs and the class seek an Order enjoining Coca-Cola from continuing to engage in unlawful acts or practices, false advertising, and any other acts prohibited by law, including those set forth in this Complaint.

**SECOND CAUSE OF ACTION**

**FALSE ADVERTISING, N.Y. GEN. BUS. L. § 350**

106.    Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

107.    Coca-Cola has engaged and is engaging in consumer-oriented conduct which is deceptive or misleading in a material way, constituting false advertising in the conduct of any business, trade, or commerce, in violation of N.Y. Gen. Bus. L. § 350.

108.    Coca-Cola's use of the term "diet" in marketing Diet Coke, and the manner in which Coca-Cola markets Diet Coke, is deceptive in light of the strong evidence that aspartame causes weight gain and physical illness, as described above.

109.     Coca-Cola knew, or reasonably should have known, that marketing Diet Coke as "diet" and the manner in which Coca-Cola markets Diet Coke, was untrue or misleading.

110.     As a result of Coca-Cola's false advertising, Plaintiffs and the class have suffered and continue to suffer substantial injury, including damages, which would not have occurred but for the false and deceptive advertising, and which will continue to occur unless Coca-Cola is permanently enjoined by this Court.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

111.     Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

112.     Coca-Cola misrepresented to Plaintiffs and the class the characteristics and benefits of the product Diet Coke, and omitted material facts concerning the true nature of the products.

113.     Coca-Cola owed a duty to Plaintiffs and the class to exercise reasonable care when issuing statements or disclosures regarding the product Diet Coke's characteristics and benefits.

114.     Coca-Cola's statements and disclosures regarding the characteristics and benefits of the product Diet Coke were likely to deceive Plaintiffs and the class.

115.     Coca-Cola's omissions of material information were likely to deceive Plaintiffs and the class in that, had Coca-Cola not omitted such material information, the disclosure of that information would have resulted in Plaintiffs and the class acting differently, for example, not purchasing the product Diet Coke.

116.    Coca-Cola's claims have influenced or are likely to influence future decisions of consumers and the buying public. Plaintiffs and the class, by purchasing the product Diet Coke, reasonably acted in reliance on the truth of Coca-Cola's representations, and the absence of the material information that Coca-Cola deceptively omitted.

117.    As a direct and proximate result of Plaintiffs' and the class's reliance upon the representations made by Coca-Cola, Plaintiffs and the class have sustained damages and ascertainable loss.

## FOURTH CAUSE OF ACTION
## INTENTIONAL MISREPRESENTATION/FRAUD
### N.Y. C.P.L.R. 213

118.    Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

119.    Coca-Cola has engaged and is engaging in intentional misrepresentation resulting in fraud in violation of N.Y. C.P.L.R. 213.

120.    Coca-Cola represented to the public, including to plaintiffs and the class, that the product Diet Coke would assist in weight loss or healthy weight management, and would not contribute to weight gain.

121.    Coca-Cola's representations were false and misleading.

122.    At the time Coca-Cola made statements or representations regarding the nature and qualities of the product Diet Coke, Coca-Cola knew that the statements and representations were false and misleading.

123.    Coca-Cola made the misrepresentations alleged herein with the intention of inducing and persuading Plaintiffs and the class to purchase the product Diet Coke.

124.     Coca-Cola further withheld and omitted material information about the product Diet Coke with the intention of inducing and persuading Plaintiffs and the class to purchase the products.

125.     Plaintiffs and the class, by purchasing the product Diet Coke, reasonably relied on Coca-Cola's false and misleading statements and misrepresentations, and on the absence of the material information that Coca-Cola deceptively omitted.

126.     As a direct and proximate result of Coca-Cola's intentional misrepresentations and deceptive omissions, Plaintiffs and the class were induced to pay, and pay a premium for, the product Diet Coke.

127.     Plaintiffs and the class were damaged through their purchase and use of the product Diet Coke.

128.     Plaintiffs' and the class's reliance on Coca-Cola's statements and representations of the nature and characteristics of the product Diet Coke was reasonable.  As a result, Coca-Cola is guilty of malice, oppression, and fraud, and Plaintiffs and the class are therefore entitled to recover exemplary or punitive damages.

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

129.     Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

130.     Through the label of Diet Coke, Coca-Cola made affirmations of fact or promises, and made descriptions of goods, that formed part of the basis of the bargain, in that Plaintiffs and the class purchased the Diet Coke in reasonable reliance on those statements.

131.    Specifically, Coca-Cola made statements that Diet Coke is "diet" and marketed Diet Coke through affirmative statements regarding Diet Coke, which indicate or imply that it will assist in weight loss or healthy weight management.

132.    Coca-Cola breached its express warranties by selling products that are not "diet," i.e., do not assist in weight loss or healthy weight management, but which in fact cause weight gain.

133.    That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiffs and class members paid for the Diet Coke.

134.    Plaintiffs gave Coca-Cola notice of the breach before filing or asserting the claim, but Coca-Cola failed to remedy the breach.

135.    As a result, Plaintiffs seek, on behalf of themselves and other class members, actual damages arising as a result of Coca-Cola's breach of express warranty.


## SIXTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

136.    Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

137.    Coca-Cola, through its acts and omissions set forth herein, in the sale, marketing and promotion of Diet Coke, made representations to Plaintiffs and the class that Diet Coke would assist in weight loss or healthy weight management, and would not contribute to weight gain.

138.    Coca-Cola is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the class, and there was, in the sale to Plaintiffs and other consumers, an implied warranty that those goods were merchantable.

139.    However, Coca-Cola breached that implied warranty in that Diet Coke does not contribute to weight loss or healthy weight management, and instead contributes to weight gain and increases the risk of illness, as set forth in detail herein.

140.    As an actual and proximate result of Coca-Cola's conduct, Plaintiffs and the class did not receive goods as impliedly warranted by Coca-Cola to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

141.    Plaintiffs gave Coca-Cola notice of the breach before filing or asserting the claims, but Coca-Cola failed to remedy the breach.

142.    As a result, Plaintiffs seek, on behalf of themselves and other class members, actual damages arising as a result of Coca-Cola's breaches of implied warranty.

## SEVENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF FITNESS

143.    Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

144.    In selling the product Diet Coke to Plaintiffs and the class, Coca-Cola impliedly warranted that the goods sold were fit for their particular purpose, e.g., would assist in weight loss or healthy weight management, and would not contribute to weight gain, or cause illness as described above.

145.    Coca-Cola breached the warranty in that the product Diet Coke did not provide the benefits advertised.

146.    Plaintiffs and the class suffered injury as a result of Coca-Cola's breach in that they paid money for a product that does not contribute to weight loss or healthy weight management, and instead contributes to weight gain, as set forth in detail herein.

147.    Plaintiffs, on behalf of themselves and the class, seek actual damages for Coca-Cola's breach of warranty.

## EIGHTH CAUSE OF ACTION
### RESTITUTION

148.    Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

149.    By virtue of deceptive and unlawful business practices, Coca-Cola charged and received payment for the product Diet Coke.  Coca-Cola should not be permitted to retain those payments in equity and good conscience, as those payments were obtained in contravention of the law.  To permit Coca-Cola to retain those payments would wrongfully confer a benefit upon Coca-Cola at the expense of Plaintiffs and the class.

150.    Under the circumstances, it would be inequitable for Coca-Cola to retain these ill- gotten benefits, and therefore restitution to Plaintiffs and the class is warranted.

## PRAYER FOR RELIEF

151.    Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Coca-Cola as to each and every cause of action, and the following remedies:

a.    An Order certifying this action as a class action, appointing Plaintiffs as Class Representatives, appointing their counsel as Class Counsel, and requiring Coca-Cola to bear the cost of class notice;

b.    An Order enjoining Coca-Cola from marketing Diet Coke as "diet" so long as it is sweetened with a non-nutritive artificial sweetener;

c.      An Order requiring Coca-Cola to engage in a corrective advertising campaign.

d.      An Order requiring Coca-Cola to pay restitution to restore funds that may have been acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the statutes cited herein;

e.      An Order requiring Coca-Cola to pay all statutory, compensatory, and punitive damages permitted under the causes of action alleged herein;

f.      An Order requiring Coca-Cola to disgorge or return all monies, revenues, profits, or other unjust enrichment obtained by means of any wrongful or unlawful act or practice;

g.      Pre- and post-judgment interest;

h.      Costs, expenses, and reasonable attorneys' fees; and

i.      Any other and further relief as may later be requested, or which the Court deems necessary, just, or proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: April 30, 2018               __/s/ Abe Melamed_____

**DEREK SMITH LAW GROUP, PLLC**
ABRAHAM Z. MELAMED (AM1520)
*Abe@dereksmithlaw.com*
DEREK T. SMITH (DS1747)
*dtslaws@msn.com*
30 Broad Street, 35th Floor
New York, New York 10004
Phone: (212) 587-0760

**THE LAW OFFICE OF JACK FITZGERALD, PC**

JACK FITZGERALD (JF3831)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (*phv*)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (*phv*)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**SACKS WESTON DIAMOND, LLC**
ANDREW SACKS (*phv*)
*asacks@sackslaw.com*
JOHN WESTON (*phv*)
*jweston@sackslaw.com*
1845 Walnut Street, Suite 1600
Philadelphia, Pennsylvania 19103
Phone: (215) 925-8200

***Counsel for Plaintiffs and the Proposed Class***