UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X
EVAN GEFFNER and IVAN BABSIN, on
Behalf of themselves, all others
Similarly situated, and the general
public,

Plaintiffs,

- against -

17 Civ. 7952 (LLS)

OPINION & ORDER

THE COCA-COLA COMPANY,

Defendant.
- - - - - - - - - - - - - - - - - - -X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 10/31/18 |

In this consumer fraud class action, the plaintiffs claim that,
by marketing Diet Coke as "diet," The Coca-Cola Company ("Coca-Cola")
misleads consumers into believing that drinking Diet Coke will assist
in weight loss or healthy weight management.

The plaintiffs filed the original complaint on October 16, 2017,
which Coca-Cola moved to dismiss. In response to the motion to
dismiss, the plaintiffs filed the first amended complaint ("FAC" or
"complaint") on April 30, 2018 (Dkt. No. 28). Coca-Cola now moves
for dismissal of that complaint. For the following reasons, Coca-
Cola's motion (Dkt. No. 29) is granted.

- 1 -

## BACKGROUND

### *The Claims*

The complaint alleges that using the word "diet" to market Diet Coke is false, misleading, and unlawful. According to the plaintiffs, Coca-Cola's representation that Diet Coke is "diet" implies it will assist in weight loss or weight management. The plaintiffs cite scientific studies to show that the opposite is true: nonnutritive sweeteners like aspartame interfere with the body's ability to properly metabolize calories, leading to increased risk of weight gain and health problems. They also rely on a consumer survey to show that a majority of consumers expect diet soft drinks to help them lose weight or maintain/not affect their weight.

The plaintiffs assert claims for unfair and deceptive business practices under New York General Business Law ("NYGBL") § 349, false advertising under NYGBL § 350, negligent misrepresentation, intentional misrepresentation/fraud, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness, and restitution.

### *The Parties*

The named plaintiffs are Evan Geffner and Ivan Babsin, both of whom have been frequent purchasers of Diet Coke and, for many years, have struggled with obesity. They both "purchased and consumed Diet Coke in large part because [they] believed, based on Coca-Cola's

- 2 -

advertising the product as 'Diet,' and the manner in which Coca-Cola markets Diet Coke, that it would contribute to healthy weight management, and, due to its lack of calories, would not cause [them] to gain weight."  FAC ¶¶ 66, 68 (alterations added).

Coca-Cola introduced Diet Coke in 1982 as a low-calorie alternative to sugar-sweetened soft drinks, and it continues to sell and market Diet Coke today.  Diet Coke is sweetened with aspartame and other sweeteners instead of sugar.  It contains zero calories per serving.

### *Advertisements for Diet Coke*

Coca-Cola has run several advertisements for Diet Coke, which the plaintiffs claim reinforce the message that Diet Coke will help consumers lose or maintain weight.  One longstanding 1980s advertising campaign claimed that Diet Coke "will not go to your waist" and is "suitable for carbohydrate and calorie-reduced diets."  FAC ¶ 17.  Multiple television advertisements from the 1990s and 2000s show groups of women running to watch physically fit men drink Diet Coke.  Id. ¶¶ 21-23.  Print advertisements have similar themes: one depicts a slim Diet Coke bottle with its label hanging loose, while several others show thin and physically fit men and women drinking Diet Coke.  Id. ¶¶ 24-31.

The American Beverage Association, of which Coca-Cola is a member, has also promoted messages regarding diet soft drinks and

- 3 -

weight loss. In 2014, it funded a study of soft drinks which purported to show that "diet beverages can help with weight loss," (FAC ¶ 34), and published an article claiming that "low-calorie-sweeteners can help reduce calories and sugar intake and aid in maintaining a healthy weight - or even dropping some weight" (Id. ¶ 35).

### *Plaintiffs' Survey*

In April 2018, the plaintiffs conducted a survey of 400 California diet soft drink consumers and 400 nationwide soft drink consumers, with the following results:

|  | California Consumers *400 Respondents* | Nationwide Consumers *400 Respondents* | California Diet Coke Consumers *330 Respondents* | Nationwide Diet Coke Consumers *336 Respondents* |
|---|---|---|---|---|
| Expect drinks labeled "diet" to help you lose weight | 12.5% | 15.0% | 11.8% | 15.2% |
| Expect soft drinks labeled "diet" to help you maintain/not affect your weight | 63.3% | 62.0% | 63.9% | 62.5% |
| Expect soft drinks labeled "diet" to make you gain weight | 3.3% | 2.0% | 3.0% | 2.4% |
| Don't have any expectations | 21.0% | 21.0% | 21.2% | 19.9% |

FAC ¶ 41.

- 4 -

### *Plaintiffs' Cited Studies*

The first amended complaint relies on studies to support the contention that non-nutritive sweeteners ("NNS") like aspartame cause risk of weight gain.  Those studies include thirteen studies and review articles cited in the original complaint, as well as several studies added to the first amended complaint.

The originally cited studies contain findings such as:

- "The addition of NNS to diets poses no benefit for weight loss or reduced weight gain without energy restriction."[1]
- "Data from large, epidemiologic studies support the existence of an association between artificially-sweetened beverage consumption and weight gain in children."[2]
- "While people often choose 'diet' or 'light' products to lose weight, research studies suggest that artificial sweeteners may contribute to weight gain."[3]

The newly cited studies contain findings such as:

- Aspartame consumption alters the intestinal microbes in a way that causes glucose intolerance.[4]

---

[1] Richard D. Mattes & Barry M. Popkin, Nonnutritive Sweetener Consumption in Humans: Effects on Appetite and Food Intake and Their Putative Mechanisms, Am. J. Clinical Nutrition 89(1), Jan. 2009, at 1-14 (cited at FAC ¶ 53(a)).

[2] RJ Brown et al., Artificial Sweeteners: A Systematic Review of Metabolic Effects in Youth, Int'l J. Pediatric Obesity (5)4, Aug. 2010, at 305-12 (cited at FAC ¶ 53(b)).

[3] Qing Yang, Gain Weight by 'Going Diet?' Artificial Sweeteners and the Neurobiology of Sugar Cravings, Yale J. Biology & Med. 83(2), at 101-08, June 2010 (cited at FAC ¶ 53(c)).

[4] Jotham Suez et al., Artificial Sweeteners Induce Glucose Intolerance by Altering the gut Microbiota, Nature, Oct. 2015, at 181-86 (cited at FAC ¶ 45).

- Aspartame consumption by rats "resulted in hyperglycemia and an impaired ability to respond to insulin."[5]

- "There now exists a body of evidence, from a number of investigators, that animals chronically exposed to any of a range of LCSs [low-calorie sweeteners] – including saccharin, sucralose, acesulfame potassium, aspartame, or the combination of erythritol + aspartame – have exhibited one or more of the following conditions: increased food consumption, lower post-prandial thermogenesis, increased weight gain, greater percent body fat, decreased GLP-1 release during glucose tolerance testing, and significantly greater fasting glucose, glucose area under the curve during glucose tolerance testing, and hyperinsulinemia, compared with animals exposed to plain water or – in many cases – even to calorically-sweetened foods or liquids."[6]

- "frequent use of diet beverages has been associated prospectively with increased long term risk and/or hazard of a number of cardiometabolic conditions usually considered to be among the sequelae of obesity: hypertension, metabolic syndrome, diabetes, depression, kidney dysfunction, heart attack, stroke, and even cardiovascular and total mortality."[7]

- "Using different models and approaches to account for initial 'indication' and changing usage patterns, we consistently found low-calorie sweetener use associated with weight gain and expanding waistline."[8]

- "The absence of evidence to support the role of ASBs [artificially sweetened beverages] in preventing weight gain and the lack of studies on other long-term effects on

---

[5] Marie S.A. Palmnas et al., Low-Dose Aspartame Consumption Differentially Affects Gut Microbiota-Host Metabolic Interactions in the Diet-Induced Obese Rat, PLoS ONE 9(10), Oct. 2014, at 9 [hereinafter Palmnas Study] (cited at FAC ¶ 45).

[6] SPG Fowler, Low-Calorie Sweetener Use and Energy Balance: Results from Experimental Studies in Animals, and Large-Scale Prospective Studies in Humans, Physiological Behav. 164(B), Apr. 2016 [hereinafter Fowler Study] (cited at FAC ¶ 49).

[7] Fowler Study (cited at FAC ¶ 50).

[8] Chee W. Chia et al., Chronic Low-Calorie Sweetener Use and Risk of Abdominal Obesity Among Older Adults: A Cohort Study, PLoS ONE 11(11), Nov. 2016 [hereinafter Chia Study] (cited at FAC ¶ 51).

health strengthen the position that ASBs should not be
promoted as part of a healthy diet."[9]

## *The Statutory Scheme*

In 1978, the U.S. Food and Drug Administration ("FDA") first
authorized use of the term "diet" for products that qualified as "low
calorie" or "reduced calorie" and were labeled as such.   21 C.F.R.
§ 105.66(c), (d), (e).   Congress later passed the Nutrition Labeling
and Education Act of 1990 ("NLEA"), which amended the Food, Drug, and
Cosmetic Act ("FDCA") and established uniform food labeling
requirements.   Pub. L. No. 101-535, 104 Stat. 2353 (1990).   The NLEA
was created in response to the need for "consistent, enforceable
rules pertaining to the claims that may be made with respect to the
benefits of nutrients in foods."   H.R. Rep. 101-538, at 8 (1990).

Section 343(r) of the NLEA describes when a label containing
nutrition content and health claims will be deemed misbranded.   It
provides an exception for the term "diet" used in soft drink brand
names if:

> (i) such claim is contained in the brand name of such soft
> drink, (ii) such brand name was in use on such soft drink
> before October 25, 1989, and (iii) the use of the term
> "diet" was in conformity with section 105.66 of title 21 of
> the Code of Federal Regulations.   Such a claim is subject
> to paragraph (a).

---

[9] Maria Carolina Borges et al., Artificially Sweetened Beverages and the Response to
the Global Obesity Crisis, PLoS Med, 14(1), Jan. 2017 [hereinafter Borges Study]
(cited at FAC ¶ 52)

- 7 -

21 U.S.C. § 343(r)(2). Paragraph (a) refers to subsection 343(a), which provides that a "food shall be deemed to be misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a). The implementing federal regulations grandfather in pre-1989 soft drinks whose labels complied with the 1989 definition:

> A soft drink that used the term diet as part of its brand name before October 25, 1989, and whose use of that term was in compliance with § 105.66 of this chapter as that regulation appeared in the Code of Federal Regulations on that date, may continue to use that term as part of its brand name, provided that its use of the term is not false or misleading under [21 U.S.C. § 343(a)].

21 C.F.R. § 101.13(q)(2) (alteration added).

Section 343-1 prohibits a state or local government from establishing "any requirement respecting any claim of the type described in section 343(r)(1) of this title made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title . . ." 21 U.S.C. § 343-1(a)(5). A state regulation is "not identical to" a federal regulation if it imposes obligations or contains provisions concerning the labeling of food which "Are not imposed by or contained in" or "Differ from those specifically imposed by or contained in" the applicable provisions of the FDCA or its implementing regulations. 21 C.F.R. § 100.1(c)(4)(ii).

- 8 -

## DISCUSSION

### *Express Preemption and Safe Harbor*

"The key to the preemption inquiry is the intent of Congress.

Congress may manifest its intent to preempt state or local law

explicitly, through the express language of a federal statute, or

implicitly, through the scope, structure, and purpose of the federal

law." New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97,

103 (2d Cir. 2010) (citing Altria Grp., Inc. v. Good, 555 U.S. 70, 76

(2008)). The Supreme Court has explained that,

> in all pre-emption cases, and particularly those in which
> Congress has legislated in a field which the States have
> traditionally occupied, we start with the assumption that
> the historic police powers of the States were not to be
> superseded by the Federal Act unless that was the clear and
> manifest purpose of Congress.

Wyeth v. Levine, 555 U.S. 555, 565 (2009) (internal quotations,

citations, and alterations omitted). "It has long fallen within the

province of states to safeguard the health and safety of their

citizens." Desiano v. Warner-Lambert & Co., 467 F.3d 85, 86 (2d Cir.

2006) (citing Medtronic v. Lohr, 518 U.S. 470, 475 (1996)). Courts

"have a duty to accept the reading that disfavors pre-emption" when

such a reading is plausible. Bates v. Dow Agrosciences LLC, 544 U.S.

431, 449 (2005); see also Cipollone v. Liggett Grp., Inc., 505 U.S.

504, 518 (1992) (the presumption against the preemption of state

police power regulations "reinforces the appropriateness of a narrow

reading" of federal provisions).

Coca-Cola argues that the FDCA authorizes its use of the term "diet" in Diet Coke. This argument fails. The FDCA merely exempts soft drinks using the term "diet" from certain labeling requirements; it does not affirmatively approve or require it. Coca-Cola claims that the "use of a double negative to create a positive authorization, reader-unfriendly though it may be, is endemic to the FDCA." Coca-Cola Br. (Dkt. No. 30) at 18. Yet unlike the statutes interpreted in the cases that Coca-Cola relies on for support, Section 343(r)(2)(D) does not require the use of the term "diet" for soft drinks.

Coca-Cola further argues that the plaintiffs' state law claims would impose additional requirements that are not identical to the FDCA's prohibition of false or misleading claims. This argument is inconsistent with the FDCA. Coca-Cola reads subsection 343(a) to prohibit only statements that are false or misleading as to the drink's calorie content. But subsection 343(a), which prohibits statements that are false or misleading "in any way," is not so limited. Thus, false or misleading statements regarding the term "diet" in labeling soft drinks are not limited to statements regarding calorie content.

Coca-Cola also argues that the plaintiffs' claims under NYGBL §§ 349-350 are barred by the "safe harbor" clauses of those statutes. The safe harbor clauses provide a "complete defense" to claims

challenging conduct or advertising that is "subject to and complies
with the rules and regulations" of any federal agency, including the
FDA. N.Y. Gen. Bus. L. §§ 349(d), 350-d. For the reasons described
above, the FDCA does not authorize use of the term "diet" if it is
used in a false or misleading manner. Accordingly, the safe harbor
defense fails.

## *Failure to State a Claim*

"To survive a motion to dismiss, a complaint must plead 'enough
facts to state a claim to relief that is plausible on its face.'"
Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A
claim has facial plausibility when the plaintiff pleads factual
content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009).

As district courts have held in four similar cases,[10] the
complaint in this case fails to allege plausibly that reasonable
consumers believe drinking Diet Coke will assist in weight loss.
Rather, as shown in the plaintiffs' survey, the majority of them
expect diet soft drinks to not affect their weight. FAC ¶ 41. They

---

[10] Becerra v. Dr Pepper/Seven Up, Inc., No. 17-cv-5921 (WHO), 2018 U.S. Dist. LEXIS
142074, at *10-11, *27-28 (N.D. Cal. Aug. 21, 2018); Becerra v. Coca-Cola Co., 17-
cv-5916 (WHA), 2018 U.S. Dist. LEXIS 31870, at *8 (N.D. Cal. Feb. 27, 2018); Manuel
v. Pepsi-Cola Co., 17-cv-5955 (PAE), 2018 U.S. Dist. LEXIS 83404, at *20 (S.D.N.Y.
May 17, 2018); Excevarria. v. Dr. Pepper Snapple Grp. Inc. 17-cv-7957 (GBD), Order,
Dkt. No. 54 (S.D.N.Y. Apr. 18, 2018).

understand that Diet Coke is simply a zero-calorie alternative to
regular Coke.

"[I]n determining whether a reasonable consumer would have been
misled by a particular advertisement, context is crucial." Manuel v.
Pepsi-Cola Co., 2018 U.S. Dist. LEXIS 83404 (quoting Fink v. Time
Warner Cable, 714 F.3d 739, 742 (2d Cir. 2013)). In the context of
soft drinks, dictionaries define "diet" as having fewer calories than
a non-diet version. See, e.g., Diet (adj.), Merriam-Webster's
Collegiate Dictionary (11th ed.) ("1: reduced in or free from
calories <a diet soft drink>"); Diet (adj.), The American Heritage
Dictionary of the English Language (5th ed.) ("2.a. Having fewer
calories. b. Sweetened with a noncaloric sugar substitute."). As the
court held in Becerra v. Coca-Cola Co., "Reasonable consumers would
understand that Diet Coke merely deletes the calories usually present
in regular Coke, and that the caloric reduction will lead to weight
loss only as part of an overall sensible diet and exercise regimen
dependent on individual metabolism." 2018 U.S. Dist. LEXIS 31870, at
*9. The brand name "Diet Coke" conveys to reasonable consumers that
the soft drink contains fewer calories than non-diet soft drinks -
not that it will, on its own, lead to weight loss or healthy weight
management.

The advertisements cited in the complaint do not render the
plaintiffs' claims plausible. The plaintiffs do not contend that the

- 12 -

advertisements themselves are false or misleading, but only that they reinforce Coca-Cola's messages regarding Diet Coke.[11] However, as Judge Engelmayer explained in Manuel v. Pepsi, "the message or implication of a commercial advertisement is not the measure of how a reasonable consumer would understand a nutrition label term like 'diet.'" 2018 U.S. Dist. LEXIS 83404, at *24; see also Becerra v. Coca-Cola, 2018 U.S. Dist. LEXIS 31870, at *9 ("Reasonable consumers understand that advertising will feature healthy and attractive consumers enjoying the subject products and will not star the unhealthy and unfit. Such advertising cannot be said to imply that a product will cause weight loss without regard to exercise and nutrition."). Neither is it plausible that the qualified language in the American Beverage Association's study and article would cause reasonable consumers to believe that Diet Coke, in itself, would cause them to lose or maintain weight.

The plaintiffs' consumer survey does not prove otherwise. The results show that only 15.0% of nationwide consumers expect drinks labeled "diet" to "help you lose weight," and 62.0% of nationwide consumers expect soft drinks labeled "diet" to "help you maintain/not affect your weight" (the numbers for nationwide Diet Coke consumers

---

[11] They also claim the advertisements are relevant to issues that could arise later in the case, such as establishing materiality for class certification or proving the elements for punitive damages. See Geffner Br. (Dkt. No. 34) at 27. Those issues are not to be decided at this stage.

are 15.2% and 62.5%, respectively). FAC ¶ 41. The majority of
consumers expected that drinks labeled "diet" would either help them
maintain or not affect their weight.

Nor do the studies cited in the FAC, taken in the light most
favorable to the plaintiffs, show that "consumption of aspartame
**increases the risk** that a consumer will gain weight or develop
hyperglycemia."[12] Geffner Br. at 29 (emphasis in original). None of
the cited studies show a causal link between the aspartame in Diet
Coke and risk of weight gain or health problems; indeed, many caution
against a finding of causality. One of the newly cited studies notes
only that frequent diet soda consumption "has been associated
prospectively" with conditions "usually considered among the sequelae
of obesity," and concluded, "In summary, the available evidence does
not directly support a role of [artificial sweeteners] in inducing
weight gain or metabolic abnormalities . . ." Borges Study (cited at
FAC ¶ 52). Another study found that "observational data in humans
cannot show causality." Palmnas Study (citations omitted) (cited at
FAC ¶ 45). One observational study found that, although use of low-
calorie sweeteners was "associated" with weight gain, it "cannot rule

---

[12] The argument that there is a separate compensable claim for "risk" is only
semantic, and adds nothing: the "risk" is that Diet Coke causes weight gain, and
that risk can never exceed proof of causation itself, for that risk is offset by
the amount of risk that it does not cause weight gain (both of which are
speculative). The whole concept of "risk" is captured by the common law provision
that any fact can be proved by a preponderance of the evidence, but that
preponderance cannot rest on speculation, which is why correlation is not enough.

- 14 -

out the possibility of unmeasured confounders." Chia Study (cited at FAC ¶ 51).

The cases that the plaintiffs cite to support their "risk of weight gain" argument rest on the theory that the risk arises from the consumption of added sugar – the one ingredient that is entirely absent from Diet Coke. Geffner Br. at 29 (collecting cases, including Krommenhock v. Post Foods, LLC, 255 F. Supp. 3d 938, 963 n.31 (N.D. Cal. 2017) (the question is "whether plaintiffs have plausibly alleged that added sugar created health risks such that Post's 'health' claims were misleading"); Hadley v. Kellogg Sales Co., 273 F. Supp. 3d 1052, 1066 (N.D. Cal. 2017) ("Plaintiff provides scientific studies that link added sugar to cardiovascular disease, metabolic syndrome, and diabetes")).

The studies' equivocal results "do no more than queue up for analysis by future researchers the issue whether there is a causal relationship between NNS consumption and weight gain." Manuel v. Pepsi, 2018 U.S. Dist. LEXIS 83404, at *33. The newly cited studies do not change the result that other courts have reached in similar cases. See, e.g., Becerra v. Dr Pepper, 2018 U.S. Dist. LEXIS 54937, at *18 ("the studies do not allege causation at all – at best, they support merely a correlation or relationship between artificial sweeteners and weight gain, or risk of weight gain"); Manuel v. Pepsi, 2018 U.S. Dist. LEXIS 83404, at *32 (the plaintiffs' complaint

- 15 -

"does not make non-conclusory allegations that NNS consumption causes weight gain, or even a risk of weight gain"). The studies cited in the complaint may support a correlation between aspartame consumption and risk of weight gain or health problems – but that does not rule out other factors or plausibly support "risk" or causation.

## CONCLUSION

Coca-Cola's motion to dismiss (Dkt. No. 29) is granted, and the clerk is respectfully directed to close this case.

So ordered.

Dated: New York, New York
       October 31, 2018

Louis L. Stanton

LOUIS L. STANTON
U.S.D.J.

- 16 -